SHULTZ, &c.
*vs*
OHIO INSURANCE
COMPANY.

---

COVENANT.

# Shultz, Porter, and Hodge *vs* The Ohio Insurance Company.

Case 102.

APPEAL FROM THE MASON CIRCUIT.

*Policy of insurance. Insurers and insured. Partial loss. Salvage. Trans-shipment. Extra freight.*

May 26.

JUDGE MARSHALL delivered the Opinion of the Court.

Terms of the policy sued on.

THIS action of covenant was brought by Shultz upon a policy of insurance, dated on the 14th of July, 1838, whereby they were assured by the defendants in $4894 30-100, on 200 pieces of bagging and 233 coils of bale rope, shipped on board the steam boat Corinthian, at Maysville. The risk and adventure to commence at Maysville, and to continue until the goods should be landed safely at New Orleans. The insurers took upon

themselves the perils of the rivers, fires, &c. And in case of loss or misfortune, it was made the duty of the insured to labor, travel, &c. for the safeguard and recovery of the goods, to the charges whereof, the insurers agreed to contribute in proportion as the sum insured is to the whole sum at risk. It was also agreed that the assurers were not to be liable for any fatal loss, or for any general or particular average unless said loss or average should amount to ten per cent. on the value.

It appears that, about the 17th or 18th of July, while the steam boat Corinthian was proceeding on her voyage, and when she was near and below the port of Louisville, she unavoidably ran upon a log or snag in the river, whereby she was so injured as to render her unable to proceed further, and that, thereby, 19 pieces of the bagging and 27 coils of the bale rope, insured, were wet and damaged, to the amount of about $162, and that the insured, laboring, &c. for the safety of the goods, and with the express sanction of the assurers, incurred charges for removing the goods from the wreck, overhauling the damaged articles, average, and port-warden's charges, to the amount of $118 99, which the defendants agreed to pay before this suit was brought. It further appears that the goods were re-shipped at Louisville for New Orleans; the sound goods, on the 22nd of July, by the master of the Corinthian, and the damaged goods by the plaintiffs, by another boat, and probably afterwards; that the original freight fom Maysville to New Orleans was 50 cents per 100 lbs. amounting to $220 61½ cents, of which $97 50 cents, were paid as *pro rata* freight to Louisville; and that the freight agreed to be paid for transporting the uninjured goods from Louisville to New Orleans was $1, per hundred lbs.

The damaged goods, as was agreed on the trial, were shipped at the lowest rate at which it could *then* be had, and perhaps the same admission should be understood as to the sound goods. <span>Facts agreed in the cause.</span>

Upon these facts the Circuit Judge, to whom the cause was submitted on an agreed case to determine the facts and the law without the intervention of a jury, gave judg- <span>Judgment of Circuit Court on the agreed case.</span>

Insurers who are to be liable only when the loss amount to 10 per cent. on the amount insured; but who further agree to pay, proportionably for salvage, are bound for their proportion of salvage expenses, though the loss amount not to 10 per ct.

ment against the plaintiffs, from which they have appealed to this Court.

The first question is, whether the plaintiffs were entitled to recover the charges for salvage above stated, amounting to $118 99. It is contended that they are not, because the damage upon the goods did not amount to the rate of 10 per cent.; and that, as the assurers are not liable under the policy for the loss upon the goods themselves, they are not liable for incidental charges. The case of *Biays* vs *Chesapeake Insurance Company*, 7 *Cranch*, is referred to as authority for this position. But that case only decides that, where the accident could not have occasioned a loss for which the assurers would be liable under the policy, they are not liable for charges incurred in saving the goods from the consequences of that accident. But here it is sufficiently certain, even without resorting to the express authority or sanction given by the defendants, that the removal of the goods from the sinking boat was necessary for preventing a loss which must have fallen upon them. And whether the express provision on this subject would or would not authorize a recovery for such charges, when it does not appear that there would have been a loss for which the assurers would be liable, if it had not been prevented by the assured, we are satisfied that it is not necessary that such a loss should have actually occurred to entitle the assured to remuneration. The plaintiffs were therefore entitled to recover the sum of $118 99, the charges for saving the goods from the wreck, and putting them in good condition. And the Court erred in not giving judgment for this sum at least.

As this sum, when added to the damage to the goods, ($162,) will be far below the ten per cent. on the whole value, which would render the insurers liable for the damage to the goods, it will be unnecessary to decide whether the salvage loss can be thus taken into the estimate, unless some other item can also be added. Whether it can be taken in to make up the ten per cent. or not, we feel satisfied it may be recovered on the express covenant.

The second question then is, whether the insurers are bound to pay the *extra freight* occasioned by the transshipment of the goods at Louisville. The general rule, according to the authorities, both elementary and judicial, is that the insurer of the goods has nothing to do with the freight.

In the case of *Caze, &c.* vs *Balt. Ins. Co.* (7 *Cranch,* 358; 2 *Cond. Rep.* 528,) which was an action by the owners of the cargo which had been captured and abandoned, to recover freight, *pro rata itineris,* from the insurers of the cargo, the Court say, they are satisfied that " as " between the insured and the under-writer on the cargo " of a ship, the latter is in no case responsible for the " payment of freight, whether there be an abandonment " or not. It is a charge on the cargo, against which he " does not undertake to indemnify the owner. " And in the subsequent case of the *Columbia Ins. Co.* vs *Catlett,* 12 *Wheaton,* 383; 6 *Cond. Rep.* 551, in which the question in adjusting the loss after an abandonment was, whether the freight for the outward voyage, being part only of the adventure covered by the insurance, should be allowed to the owner, and deducted from the salvage received by the under-writer, the Court say: " As be- " tween the owner of the ship and the owner of the car- " go, the former has a lien upon the cargo for all the " freight which becomes due and payable to him, whether " it be a full or *pro rata* freight. But freight is a charge " upon the cargo against which the under-writers do not, " in any event, whether of abandonment with salvage, or " of partial loss, undertake to indemnify the owner of the " cargo. "

The question as to the *extra freight* was not directly before the Court in either of these cases, but it cannot be supposed that that question did not present itself in the consideration of the subject, when they have laid down, in the most positive terms, a general proposition necessarily including it. Similar general expressions are to be found in the English cases, and especially by Lord Mansfield, in the case of *Baillie* vs *Modigliani,* (*Marsh on Insurance,* 728.) The same general expression "that the insurer of the cargo has nothing to do with the

SHULTZ, &c.
*vs*
OHIO INSURANCE
COMPANY.

The insurer guarantys only the safe arrival of the goods, and is not liable to the insured for *extra* freight, incurred by a transshipment, in case of disaster insured against.

SHULTZ, &c.
*vs*
OHIO INSURANCE COMPANY.

freight," is also to be found in several decisions of the Supreme Court of New York, (*Marine Insurance Company* vs *United Insurance Company*, 9 *John.* 190, and cases there cited.) And the case of *Munford* vs *The Commercial Insurance Company*, 5 *John. Rep.* 265, to be hereafter more particularly noticed, is the only case, English or American, to which we have been referred, or of which we have found any trace, in which there has been an actual recovery of *extra freight* by the owner, against the insurer of the cargo.

It is, however, laid down by some of the elementary treatises that there are cases in which the insurer of the cargo is liable for *extra freight,* or the increased freight occasioned by trans-shipment. Benecke makes this liability depend generally upon the question whether the trans-shipment is for the *benefit* of the insurer; that is, as he explains it, when the master is entitled to freight *pro rata itineris,* and the loss, if the goods had not been forwarded, would have been treated as a salvage loss, and would have fallen on the insurers; the forwarding of them is for their benefit and they must bear the charges; but if the loss, had a sale taken place at the intermediate port, would have been an average one, then the goods were forwarded for the benefit of the owners, and the expense should be borne by the owner or by the underwriter on the freight.

This explanation of the rule has been attacked in argument, both on the ground of inconsistency and unintelligibility, and the rule itself is assailed as tending to sever and discriminate between interests which the exigencies of commerce require to be regarded as indissolubly united. Without attempting either a vindication or an exact exposition of the rule as illustrated by Benecke, it is sufficient to remark that it is evidently his opinion that the under-writer on the cargo is liable only in a special class of cases, for the increased expense arising from trans-shipment, and we do not perceive that this case comes within that class: But as there is no ground to suppose, the contrary being clearly presumable, that if a sale of the goods had actually taken place at Louisville, which is directly between the port of shipment and that

of consumption, there could have been a loss of ten per cent. upon the whole cargo, so as to throw any loss on the insurers under the policy; the trans-shipment cannot be supposed to have prevented or to have been intended to prevent or diminish any loss which would otherwise have fallen on them. But being obviously for the exclusive benefit of the owner or of the master, the expense, according to the rule of Benecke, should fall upon one or both of them.

The rule as laid down by *Marshall on Insurance, p.* 379, is more explicit and, if adopted in its extent, would make the insurers liable in this and in every other case in which, in consequence of the original vessel becoming disabled by one of the perils insured against, a new one is hired at an increased expense. But in the case of *Dodge* vs *The Union Marine Insurance Company,* 17 *Mass. Rep.* 475, where this passage is quoted from Marshall, the Court remarks that he cites no English case or authority in support of it, and that the foreign writers, Emerigon, Valin, and Cleirac, differ on the subject. But the Court goes on to say that the observation of Marshall, understood with its proper limitations, is not inconsistent with the principles of the law of insurance, by which, as is previously stated in the opinion, the under-writers on the cargo have nothing to do with the freight, and are guarantors only of the safe arrival of the goods, having no concern with the expense of transportation. And they limit the rule, thus understood, to the case where the freighter (*i. e.* the owner,) of the goods is compelled to pay such increased freight, by the unavoidable consequence of any of the perils insured against, as in the case of *Munford* vs *The Commercial Insurance Company,* 5 *John.,* which is referred to as an example of the restricted sense in which the rule or observation of Marshall should be understood.

In that case, goods were insured against capture, from Amsterdam to New York. The ship and cargo were captured on the voyage, by the British, and sent into Halifax, where they were libelled in the Admiralty Court. The ship being acquitted and the cargo detained for proof, the master tendered the vessel to bring on the goods, and

completed the voyage without them, whereby he earned the entire freight which was paid. And the goods being afterwards liberated, the owner transported them to New York in another vessel, for which he was of course compelled to pay a new freight. And the liability of the under-writer to pay this freight, is the matter decided in the case of *Munford* vs *The Commercial Insurance Company.*

It is true, Chancellor Kent, who as Chief Justice of the Supreme Court of New York, had delivered the opinion in the case just named, refers to it afterwards in the case of *Searl* vs *Scovel,* (4 *John. Chy. Rep.* 218,) apparently as establishing the general principle that whenever, in consequence of the original vessel having become disabled from proceeding, by a peril insured against, the goods are trans-shiped by the master, and arrive at their destination, the insurers of the goods are liable for the *extra* freight; and it seems to have been passingly mentioned in the same way, by Chancellor Walworth, in giving his opinion in the Senate of New York, sitting as a Court of Errors in the case of the *American Insurance Company* vs *Center,* 4 *Wendel,* 45. But the question in *Searl* vs *Scovel,* was not whether the insurer was liable for the extra freight, but whether the master of the original vessel who, acting for the benefit of all concerned, upon his best judgment and upon the advice of the American consul, had forwarded the goods by a new vessel from the intermediate port at which his own had become so disabled as to be condemned as unworthy, and actually sold, was entitled to a lien on the cargo for the new freight which he had contracted to pay; and the Chancellor having asserted the right of the master, in cases of distress, to bind the cargo, establishes the lien, and referred to the case in *5th Johnson,* as deciding that the insurer of the goods must pay the incresed freight arising from the necessary change of the ship.

It is clear however, from what has been already cited from the case in 17 *Massachusetts Reports,* that the Supreme Court of that state, regarded the case of *Munford* vs *The Commercial Insurance Company,* as a special case and not as establishing the general liability of the

under-writer of the goods for increased expense of trans-portation in every case where, by disaster to the original vessel, trans-shipment becomes necessary for forwarding the cargo.

In the case in the Supreme Court of Massachusetts, the freight of the second vessel was in fact less than the ratable proportion of the original freight, compared with the remaining part of the voyage, so that there was really no increase of expense, and therefore the question as to the liability of the under-writer on the cargo, though taken up and discussed, was not necessary to be decided. But the fact just noticed, illustrates what is certainly true, that trans-shipment does not always necessarily produce an increased expense in the form of freight. And the discriminating circumstance in the case of *Munford* vs *Commercial Insurance Company,* is that there the first vessel having earned the entire original freight without transporting the goods from the intermediate port to the place of destination, which was prevented by the peril insured against, the cargo could never afterwards be transported to its destination without the expense of the additional freight. So that, not only was trans-shipment necessary, but the increased expense of transportation also was absolutely necessary to the completion of the adventure, and the safe arrival of the goods, and the owner not being bound to abandon the cargo, nor to sell it in the intermediate port, had a right to incur it. The increased expense of transportation therefore, was a necessary and unavoidable consequence of the capture. The increased expense could not have been avoided by delay, and there is no suggestion nor ground for supposing that more than the customary freight was paid. If more than the customary freight had been paid, then to that extent the increased expense would not have appeared to be the necessary and unavoidable consequence of the capture, though trans-shipment would have been.

In this view of the case, the decision seems to be not only just, but entirely consistent with the principle that the insurer guarantys only the *safe arrival* of the goods. For by that guaranty he is bound to contribute to every expense necessary to ensure the *safety* of the goods and,

which is the unavoidable consequence of a peril insured against. And so he is bound to contribute to every increased expense which is necessary to their arrival, if such expense be also the necessary consequence of a peril insured against.

*Insurer does not guaranty a speedy arrival, nor against any loss by delay; unless the delay proceeded from a peril insured against, and loss upon the cargo, occasioned by such delay arising from peril insured against; nor against the loss by fluctuations in the market.*

But he does not guaranty the speedy arrival of the cargo, nor incur any loss on account of mere delay in the voyage, unless the delay be produced by a peril insured against, and the cargo in consequence of damage occasioned by such peril, or of its perishable quality, be subject to deterioration by mere lapse of time: nor does he guaranty, by his general undertaking, that the cargo shall arrive in time for an advantageous market, for he has nothing to do with the fluctuations of the market. And on this ground, Benecke seems to think it rather inconsistent with principle that, when in consequence of a peril insured against, it becomes necessary to sell the cargo at the port of accident, which is the case of salvage loss referred to by him, the insurer should be charged with the *pro rata* freight.

The law of insurance is rigid in scrutinizing the cause of a loss. It is not satisfied with the mere fact that a peril insured against has occurred, and that a loss also has subsequently occurred. The peril must have been the cause of the loss, and the law looks to the proximate and not to the remote cause. These principles, obviously necessary for protecting the insurers against imposition and collusion, are laid down by many authorities.

Mr. Phillips, in his work on Insurance, vol. 1, p. 288–9, under the head of "Loss on one subject by damage to another," says, "If the ship be wrecked or disabled "from pursuing the voyage by the perils insured against, "it is a total loss of ship and freight. The same disas- "ter may be a total loss of the cargo and the profits, &c. "that would have occurred upon it, though the whole "cargo is saved, and may have sustained no damage, if "no other vessel can be found at or near the place where "it is landed, within a reasonable time, *and at a reason- "able expense,* for carrying on the cargo to the port of "destination. But (as he goes on to say) it is a subject "of some doubt how far a loss of the ship is a partial

"loss on the goods, by subjecting the shipper to addi-"tional expense of freight by another vessel." He then states the cases of *Baillie* vs *Modigliani*, and *Caze, &c.* vs *Balt. Insurance Company*, above noticed, and remarking "that the Judges had in view cases where only one freight "was paid, (that is, as we understand, a rateable freight "to each vessel,) and not the case where one entire "freight had been earned, and an additional expense of "freight incurred on account of the perils enumerated in "the policy," he states the case of *Munford* vs *The Com. Ins. Company* as one of this description, thus confining that case to its particular circumstances. But other inferences are to be drawn from this passage in the work of Mr. Phillips. In the first place, taking the present case in the most favorable aspect for the owners of the cargo, the question as to their right to recover the extra freight as a partial loss on the cargo, is precisely the question which the author, having in view all the cases which have been referred to, and also the dicta of the foreign writers on the subject, states to be one of doubt; and further, if we apply to this question of partial loss the same test which the passage furnishes, for determining when a total loss of the ship may be a total loss of the uninjured cargo, viz: that another vessel cannot be procured in a reasonable time and at a reasonable expense, it is evident that the *reasonableness* of the expense is one of the essential elements on which the answer depends, as it is certainly one of the considerations on which the determination to forward the goods or to abandon or sell them at the port of accident should depend.

But if in case of a total loss of the first vessel it be doubtful whether the increased freight of transportation, by another, be properly a partial loss upon the cargo, so as to render the under-writers liable for it, there must be more doubt, if the first vessel is not totally lost, but is only partially injured and might be repaired in reasonable time and at reasonable cost. For if this can be done, it is the duty of the master to do it, and to forward the goods by his own vessel. And it is an objection to the right asserted in this case, that it does not sufficiently appear whether it could have been done or not; nor are we en-

tirely sure that the master, in this case, was entitled to freight, *pro rata itineris.* It certainly does not appear that the freight charged on that account was the proper *pro rata* freight for transporting the cargo to the place of the accident, nor does it appear upon what principle so large a portion of the original freight could be justly due for so small a part of the voyage. And with regard to the amount of freight agreed to be paid for carrying the cargo from Louisville to New Orleans, which was double the original amount agreed on for transportation from the more distant port of Maysville, it seems entirely certain that this increased expense must have been produced by some other cause than the mere loss of the first vessel; and that, although the cargo could not then be freighted at a lower rate, it was neither necessary nor reasonable, in any sense in which those terms can properly affect the interest of the insurers, to trans-ship immediately at so great an increase of expense. If the goods, from their own nature or in consequence of a damage sustained by reason of the peril insured against, were liable to deterioration by mere delay, then it was necessary either to ship immediately, if it could be done at a reasonable expense, or to sell at the place of the accident, and as in the latter alternative, the loss, had one occurred on the sale, might have fallen on the insurer; so in the other case, the loss, had one occurred on the trans-shipment, might perhaps have fallen properly on them. But in the present case, no such necessity for immediate trans-shipment is shown, nor does it appear that the master acted upon advice and his own best judgment, for the interest of all concerned. He may have acted, and probably did, with a view exclusively to the *pro rata* freight in which he was interested, and to the state of the market at New Orleans, in which the owners alone were interested; and it is in vain to say that the interests of all should be the same, if one of the parties having control of the subject may act without regard to the interests of another. The excess of the new freight was undoubtedly owing to a temporary cause, viz: the low stage of the river, and might have been avoided by a delay which, so far as appears, would not have deteriorated the goods nor materi-

ally injured any party. The immediate trans-shipment of the goods was, therefore, obviously intended for the benefit of the master and the owner of the cargo, or one of them, and not for the benefit of the insurer. And even if it be conceded, as perhaps it should be, that notwithstanding this circumstance, the insurers might be liable for a reasonable increase of the expense of transportation incurred principally with a view to the benefit of the master of the vessel and the owner of the cargo, there must be some limit to the additional expense which the master is at liberty to throw upon the insurer, beyond what is necessary either for the safety of the goods or for effecting their ultimate arrival at the port of destination.

To say that, for the purpose of immediately becoming entitled to his freight, *pro rata itineris*, or of giving to the owner of the cargo the advantage of the earliest possible arrival at the destined market, either the master or the owner may, upon the original vessel becoming disabled, forward the goods immediately, without regard to price of transportation, and throw the increased expense upon the insurer, as a matter of course and without showing a reasonable · necessity for the increase, would be to place him entirely at their mercy. If, therefore, there were no other objection to the recovery sought in this case, we are of opinion that, comparing the *pro rata* freight and the new freight with the original freight agreed on, and with the different portions of the voyage either in respect of time or distance, or any benefit derived, or any standard of the customary freight between the several ports, which can be deduced from their relative position, or any facts in the case; both the *pro rata* and the new freight appear to be unreasonable and the increased expense unnecessary in its amount at least; and that the plaintiffs have not shown a right to recover the sum demanded as *extra* freight, nor any other sum which, if added to the damage done to the goods by the sinking of the boat, and even including the charges of salvage, would amount, in the aggregate, to ten per cent. upon the total amount insured. Nor can we come to a different conclusion, if the bagging and rope be regarded, as perhaps they may be, as distinct subjects of insurance under the policy; for the damage

SHULTZ, &c.
*vs*
OHIO-INSURANCE
COMPANY.

To render insurer liable for expenses of transshipment, it must appear to have been rendered necessary by peril insured against, the price reasonable and incurred with a view to the interest of all concerned.

done to either separately, when increased by the proportion of the salvage charges belonging to that article, still falls far below the amount of ten per cent. on its value in the policy, and the same difficulty occurs as to the amount of extra freight, if any be properly chargable to the insurers in that case, as when the whole cargo is considered as a single subject of the insurance. And as, without allowing for the whole extra freight a considerable sum, (more than $200,) the loss by damage to the goods and the salvage charges, would not amount to ten per cent. on the value insured on the bagging and rope, either separately or in the aggregate, the plaintiffs were entitled to a judgment for the salvage charges only, amounting to $118 99.

Mandate to the Circuit Court for judgment for plaintiff.

Wherefore, the judgment which was rendered against them is reversed, and the cause remanded, with directions to render a judgment for the plaintiffs for the sum of $118 99.

*Payne & Waller* for appellants: *T. Chambers* for appellees.