## HOSTETTER & SMITH v. GRAY and others.

*(District Court, W. D. Pennsylvania.* February 18, 1882.)

1. **CARRIERS—BILL OF LADING—USAGES AS TO VOYAGE.**
   If nothing is expressed to the contrary in the bill of lading, established usages relating to a voyage are impliedly made part of the contract.

2. **SAME—DEVIATION—USAGES OF TRADE AS A TEST.**
   After the express provisions of the contract, the usage of the trade is the predominating test as to deviation, and of what belongs to the voyage, and the proper course in prosecuting it.

3. **SAME—USAGES OF TRADE—CASE STATED.**
   Where a tow-boat having a fleet of barges in tow, on a voyage from Pittsburgh to New Orleans, landed at Mt. Vernon, Indiana, and the fleet was there safely moored, and a single barge detached therefrom and towed back up stream to take on cargo at four or five different points on the Indiana and Kentucky shores, all within the distance of three miles, *held*, that it was not a deviation; it appearing that the course pursued was in conformity with the usage of the trade—a usage which tends to cheapen the cost of transportation, facilitates business, and conduces to the safety of the whole tow.

4. **EXCEPTIONS IN BILL OF LADING—DANGER OF ACCIDENTS.**
   The exception in a bill of lading of the dangers of navigation and unavoidable accidents relieves the carrier from liability for loss of the cargo of a barge which sunk by striking, without negligence, some unknown and concealed obstruction in the Ohio river.

In Admiralty.

*A. H. Clarke* and *S. A. Wills,* for libellants.

*Knox & Reed,* for respondents.

ACHESON, D. J. On December 6, 1874, the steam tow-boat Iron Mountain, having in tow several barges, (one called Ironsides No. 3,) partly loaded with a miscellaneous cargo, left Pittsburgh bound for New Orleans. The libellants shipped by the barges 2,000 boxes of bitters and 18 boxes of show-cards, which were placed on the Ironsides No. 3, the bill of lading stipulating that the goods were "to be delivered without delay, in like good order, at the port of New Orleans, Louisiana, the dangers of navigation, fire, and unavoidable accidents excepted." At the argument it was claimed in behalf of the libellants that there was a verbal agreement touching the course of transportation additional to the bill of lading, but the libel itself asserts that "in confirmation of said agreement" the bill of lading was signed, and the evidence fails to establish such alleged verbal contract. The case stands upon the bill of lading.

The tow-boat and her barges, after taking an additional cargo at various intermediate places, arrived safely at Mt. Vernon, Indiana,

819 miles below Pittsburgh, and landed to take on freight at the Mt. Vernon wharf-boat. The proprietors of the wharf-boat had engaged for the barges corn which lay piled in sacks at two or three farm landings on the Indiana shore, the furthest pile being about two miles above the wharf-boat. The tow-boat detached from the fleet the barge Ironsides No. 3, which was but partly loaded, and proceeded with it up stream to these piles. After loading this corn the boat crossed the river with the barge and took on corn which was offered at two landings on the Kentucky side, viz., New York landing, about three miles above the wharf-boat, and Whitmon's landing, which is somewhat lower down. . After taking on the corn at Whitmon's the tow-boat started to return to her fleet, but while rounding out to the river the barge suddenly took water and soon sunk, becoming a total wreck; the cargo, including the libellants' goods, sustaining great damage. This occurred late in the evening of December 18, 1874. The protest, signed by the officers and some of the crew, and executed December 23, 1874, assigns as the cause of the disaster that the boat struck some unseen obstruction. Immediate notice by telegram of the sinking of the barge with their goods was given the libellants.

The libellants brought no suit until March 4, 1880, when they filed the libel in this case against the surviving owner and the executors of a deceased owner of the tow-boat and barges *in personam.*

The original libel set forth that the barge "struck some unseen obstruction, as the libellants are informed and believe," and the only ground of liability therein alleged is that of wrongful deviation in returning up stream to New York landing, after safe arrival at Mt. Vernon.

In their answer the respondents denied that their course of action complained of was a deviation, and averred that it was lawful, customary, and right, and in accordance with the established usage of the trade in which they were plying. After this answer was filed the libellants, on March 31, 1880, filed an amended libel, in which they allege that since the filing of their original libel they had been informed and believe that the sinking of the barge was not the result of an obstruction in the river, but was caused by reason of the barge being overloaded on the port side with sacks of corn, the undue haste with which the barge was loaded, and the negligent and improper stowage of the corn thereon.

The case, therefore, as it now stands, presents for solution two main questions: *First,* was there a deviation? *Second,* if not, was the

sinking of the barge the result of one of "the dangers of navigation," and an "unavoidable accident," within the exception in the bill of lading, or was it caused by reason of the negligence charged in the amended libel?

1. A deviation is a voluntary departure, without necessity or reasonable cause, from the regular and usual course of the voyage. *Coffin* v. *Newburyport Marine Ins. Co.* 9 Mass. 447. It is, however, no deviation to touch and stay at a port out of the course of the voyage, if such departure is within the usage of the trade. *Bentaloe* v. *Pratt*, Wall. C. C. 58; *Bulkley* v. *Protection Ins. Co.* 2 Paine, C. C. 82; *Thatcher* v. *McCulloh*, Olcott, Adm. 365; *Oliver* v. *Maryland Ins. Co.* 7 Cranch, 489, 491. Where a bill of lading provides that the goods are to be carried from one port to another, a direct voyage is *prima facie* intended; but this may be controlled by usage. Thus, where the bill of lading stipulated that the goods were to be transported from New York to Georgetown, in the District of Columbia, it was held that the vessel was justified by the usage of the trade in going to Norfolk to discharge freight, although it was 30 miles out of the direct course to Georgetown. *Lowry* v. *Russell*, 8 Pick. 360. So it was held in *Columbian Ins. Co.* v. *Catlett*, 12 Wheat. 383, 387, 388, that the true meaning of the policy there in suit was to be sought in an exposition of the words, with reference to the known course and usage of the West India trade, and that what delay at St. Thomas would constitute a deviation depended on the nature of the voyage and the usage of the trade. After the explicit provisions of the contract, usage is the predominating test as to deviation. Phillips, Ins. § 980. And usage is the test of what belongs to the voyage, and the proper course in prosecuting it. Id. § 1003. Established usages relating to a voyage are impliedly made part of the contract if nothing is expressed to the contrary. *Gracie* v. *Marine Ins. Co.* 8 Cranch, 75; *Columbian Ins. Co.* v. *Catlett*, *supra*; *Robinson* v. *U. S.* 13 Wall. 366; Phillips, Ins. § 997.

These being recognized legal principles, our next inquiry is, how far are they applicable to this case? Numerous witnesses variously connected with the river trade, and having large experience, testify of their own personal knowledge that it has been the general usage since the commencement of the business of transporting merchandise on the western rivers in barges towed by steam-vessels, and constantly practiced, for such barges to take on additional cargo along the rivers *en route* to the port of destination, and in so doing for the owners or agents of such vessels and barges to land and tie up their tows at the more public or larger and safer landings, and detach from

the fleets a barge or barges and tow the same to the places in the vicinity, whether up, across, or down the stream, where cargo is awaiting shipment; and it is testified that such usage has thus prevailed at Mt. Vernon, Indiana, in respect to goods awaiting shipment at New York landing and other neighboring points.

For example:

Arthur J. Branch, the superintendent of the Evansville & New Orleans Barge Company, having testified to his connection with the Ohio river trade for 20 years, and his acquaintance with its usages, was asked this question: *Question.* "Suppose a steam-boat with several barges in tow were to land at a port on the Ohio river and there find or ascertain that there was freight for her at three or four different landings within four or five miles above said port which she passed in coming down, what has been the custom with respect to taking such freight?" To which he replied: *Answer.* "It has been to leave the tow in the safest and most convenient landing, and take one or two barges, as might be necessary, and go back. If we know when we pass the freight that we are to take it, we go below to the nearest and safest harbor for our tow, and to save time and expense. It would not be good navigation to land with our whole tow at each landing for freight, and in many cases it would be impossible to do so." Printed Ev. 71.

William A. Page testifies: "Where there are several landings to make in the same neighborhood it is almost the invariable custom to tie up the tow and then go back with one barge for the freight. Wherever I have been, and all along the Ohio, as far as my knowledge goes, this is the custom, and it is good, sound steam-boat sense everywhere. This is the custom in the neighborhood of Mt. Vernon." Id. 92.

Henry H. Sholes says: "I have known that custom to exist 20 years—ever since I have been tow-boating. It has existed, to my knowledge, in the trade between Pittsburgh and New Orleans." Id. 152.

John B. Hall, a wharf-boatman at Evansville, Indiana, speaking of the practice there, says: "A tow-boat coming down the river with four or five model barges, and having several landings to make close together above, would leave the bulk of the tow and go back up the river with the barge which was to receive the freight. This custom has prevailed all along the lower Ohio ever since I had anything to do with the river, and before I went into business. The custom at Mt. Vernon has been the same as here." Id. 89.

George G. Grammer, the superintendent of the Evansville, Cairo & Memphis Packet Company, testifies that at Evansville, Mt. Vernon, and Shawneetown there are wharf-boats, and that it is an old custom for the farmers in the vicinity thereof to make contracts there for shipping their corn from their farm landings, and that it has been the common practice for tow-boats descending the Ohio to land at these wharf-boats and make fast the tow, and take one of the barges out of the fleet and to the corn freight piles. And he adds: "I regard it as the safest for all interests concerned to select some good landing in the vicinity of these freight piles, either above or below, or at them, for that matter, and detach the particular barge they desire to load, and move it separately to the freight piles. That would be safer, because a steamboat can handle one barge better than she can handle more than one. And very often the freight is in a shoal or ragged landing, and she can get there with one barge, when she could not get there with more. That would be a much more speedy way of loading, and more convenient. This is the custom at Mt. Vernon and other points on the Ohio river for loading barges." Id. 66, 67.

Enoch E. Thomas, who has been one of the proprietors of the Mt. Vernon wharf-boat for 25 years, testifies: "The boats generally come here with their barges, and when told of corn above here to be shipped they go back for the corn. This has been the general custom here. The corn above Mt. Vernon is, as a rule, owned by parties living here, who make their shipping contracts with the boats on their arrival at this port. This custom has been observed by boats with barges partly loaded, bound from Pittsburgh to New Orleans. This has been the custom ever since I have been on the river. Our shipments cover the river from Long's landing to the mouth of the Wabash. Long's landing is six miles above Mt. Vernon." Id. 80.

Similar quotations from the testimony of the respondents' other witnesses might be greatly multiplied, were it deemed necessary.

The witnesses assign several reasons for the usage. The barges, they testify, can be more conveniently and economically handled and loaded singly than when together in the tow. A saving of time is also effected, as several barges can be loaded at different points simultaneously,—a matter of much importance in a river like the Ohio, which is subject to sudden rises and rapidly falls. But the main reason is that the usage conduces to the safety of the whole fleet, and thus operates to the advantage of every party in interest. Upon this point the witnesses are very emphatic. Where freight is to be taken on at

several points in the vicinity of such a good landing as that at Mt. Vernon, they testify that it is much the safer course to land, and leave the tow there and go back with a single barge, than to land the entire fleet at the different points.    To appreciate how heavy, and hard to handle, a tow of three or more barges is, we need but to recur to the official survey of the barge Ironsides No. 3.    Id. 121.    Her custom-house tonnage was 369, her carrying capacity 700 tons, length 180 feet, breadth 31 feet, depth 7 feet.

It is shown that there is a further and special reason for the usage at Mt. Vernon.    Ninety per cent. of the shipments in that vicinity consists of corn in sacks at different farm landings, which can be reached by a single barge, when it is often impossible to land the whole tow. The only reasonably practicable way the farmers have to get their corn to market is by barges brought to their private landings.    To haul the grain to the wharf-boat at Mt. Vernon would cost as much as the freight charges to New Orleans.    Id. 70, 73, 85.

To disprove the alleged usage the libellants examined a large number of witnesses.    Their testimony, however, is principally of a negative character.    They say they do not know of any such usage, but with rare exceptions they expressly disclaim familiarity with the usages of the trade.    They are simply ignorant upon the subject and confess their ignorance.    Thus, the following is found in the cross-examination of Charles A. Ault, a witness for the libellants:    *Question.* "Do you pretend to be at all familiar with the customs of navigation with respect to steam-boats or barges receiving and discharging freight between their terminal points?"    *Answer.* "I do not." *Question.* "Such a custom, then, as you have been asked about might exist without your knowing anything about it, might it not?"    *Answer.* "Yes, sir; it might exist without my knowing anything about it." Id. 219.    And so F. A. Bacon, being cross-examined as to the alleged usage at Evansville and Mt. Vernon in respect to corn shipments, answered: "I know nothing about that matter.    *    *    *    That may have been the universal custom without my knowledge."    Id. 329.    Upon a careful scrutiny of the evidence it will be found that the admitted want of knowledge touching the barge trade on the part of the libellants' witnesses generally is such as to deprive their testimony of force.    Several of the libellants' witnesses, however, state that they have knowledge or information that the usage in question is pursued by barges towed by steam-vessels.    The evidence submitted by the respondents in proof of the usage is positive, clear,

and convincing, and, in my judgment, is not weakened, **nor is** any doubt respecting it created, by the testimony on the part of the libellants.

The court, therefore, finds: (1) That it has been the general usage in the Pittsburgh and New Orleans barge trade, coeval with the commencement of the business, and constantly practiced, where cargo is to be taken on *en route* to the port of destination at several points in the same neighborhood, to land and tie up the tow or fleet of barges at the more commodious and safer landing, and detach from the tow the barge or barges designated to receive such cargo, and tow the same to the several points where the cargo may be stored, whether up or down stream or across the river. (2) That at the time of the sinking of the barge Ironsides No. 3 it was the general and established usage for barges towed by steam-vessels in the Pittsburgh and New Orleans trade, having cargo to receive at New York landing and other points between there and Mt. Vernon, Indiana, to land and tie up the fleet at the latter place, and tow back for such cargo the barge upon which it was to be placed; and that the course pursued by the Iron Mountain, on the occasion in question, was in conformity with such usage of the trade. (3) That the usage so practiced at Mt. Vernon and elsewhere, as mentioned in the foregoing findings, tends to cheapen the cost of transportation, facilitates business, and conduces to the safety of the whole tow; and is, therefore, a reasonable usage.

Applying, then, to these facts the legal principles already discussed, I am of the opinion that there was no deviation. When the barge Ironsides No. 3 was detached from the tow and taken to the several landings on the Indiana and Kentucky shores, it was to get cargo,—a purpose connected with the voyage. The Iron Mountain was never beyond sight of her tow, and, commercially considered, kept within the port of Mt. Vernon, according to the testimony of George W. Thomas. Id. 82. The expert testimony clearly shows that in landing at Mt. Vernon, and there leaving the bulk of her tow and taking back a single barge for cargo, her course was prudent and proper.

2. The contemporaneous declaration in the protest as to the cause of the sinking of the barge remained unchallenged for a period of five years and three months; and the original libel, verified by affidavit, ascribed the loss to the same cause. That it was not filed without an investigation of the facts may well be assumed. Indeed, the statements of the libel plainly imply that the libellants were then possessed of information as to "all the particulars of the sinking of the barge."

Death had removed S. L. Summers, the mate under whose immediate supervision the corn was loaded and stowed on the barge, and whose testimony was of the last importance. These things are to be borne in mind when we enter upon the inquiry as to the truth of the specific charge of negligence, first made in the amended libel, that the barge sunk by reason of improper loading and stowage.

To sustain this charge the libellants examined eight deck hands, viz.: Krumm, Riley, John and James H. Dunn, Martin, Leonard, Starke, and Tolen, and Anderson, a stevedore. Anderson says the barge listed at New York landing, and, indeed, was not trim when she went up. Herein, however, he is contradicted by Martin, who testifies the barge was all right at New York landing, and when she left there. The opinion Anderson undertakes to express as to the cause of the sinking I regard as entirely worthless. He did not see her sink, and left her at New York landing. I do not understand him to have been at Whitmon's at all. He admits he has had no experience with barges.

Nothing in the testimony of Krumm or Tolen tends to show that the barge was overloaded on the larboard side, or the corn improperly stowed. On the contrary, the testimony of both these witnesses, I think, strongly disproves the allegations of the amended libel. Krumm says: "When we carried the corn on the barge we carried the corn as much on the one side as the other." He also states it was when the barge got out into the river "she capsized a little on one side," and not when she commenced to back out, and that she did not careen enough to take water over her deck. The testimony of this witness throughout, in my judgment, tends to show that the cause of the sinking was as claimed by the respondents. Tolen testifies: "We stowed the corn in piles along the sides of the boat and amidships, at both places. We put as much on one side as the other, as far as my knowledge goes." He further states—in this contradicting other of the libellants' witnesses—that all the corn was stowed away except "a few sacks, probably a hundred." In his examination in chief he says: "As she was backing out she hit a snag or sprung a leak; I could not say which. We put a syphon in her and started to put another syphon in, and before we got it done she was sunk." He says she was a good barge, and there was nothing wrong with her so far as he knew. On cross-examination he was asked: "Could she have sunk in so short a time by reason of any ordinary leak not caused by striking some object?" To which he replied: "Not to the best of my knowledge; she would not have sunk without having

struck a snag or having sprung more than an ordinary leak." And he significantly added: "There was nothing to cause her to spring more than an ordinary leak unless she struck something. She must have had a very big hole in her bottom to have sunk in that short time." This, be it remembered, comes from the libellants' own witness. His testimony has peculiar value as that of one who has had a steamboat experience of 15 years, and is by occupation a sailor. I think no one, after reading this man's testimony, can accept the theory of the loss upon which the libellants now insist.

At least two of the other six deck hands who testified in behalf of the libellants were without experience on the river. The individual stories of several of these witnesses are confused and lack coherency. They differ among themselves as to important particulars, and in some very essential matters their testimony is conflicting. For example: Stark and James H. Dunn say the corn taken on at New York landing and Whitmon's was not stowed at all. On the other hand, Martin says the corn taken on at both places was stowed as received, and he describes minutely in what manner. Again: James H. Dunn testifies: "The water that sunk the barge came over her side, and from there run into her hold." On the contrary, Leonard testifies: "I rather think the water that sunk her came in from the bottom, as there was water on the dunnage when we went down to move the freight. There was half an inch or so of water on the dunnage at that time. * * * She took water very rapidly after I got out of the hold, as she sunk in three minutes after."

Five of these witnesses express the opinion that the barge sunk on account of improper loading, but they hardly agree as to what the precise negligence was. This accident, it must be observed, happened after night-fall and suddenly. It is quite plain these witnesses at the time were greatly excited. Called upon to testify nearly six years after the occurence, their opinions are to be received with allowance. They are probably honest in their opinions, but, after a very careful consideration of the whole evidence, I am persuaded they are mistaken.

It clearly appears the barge was not overloaded. Indeed, she was not nearly loaded up to her full capacity. She was well built, strong, staunch, and in perfect order. The mate who superintended her loading on this occasion, now, unfortunately, dead, is spoken of by the witnesses as a competent and trustworthy officer. The respondents examined William C. Gray, the captain of the tow-boat, Henry H. Sholes, the receiving clerk, and Joseph H. Dunlap, the agent of

the "Iron Mountain" barge line.   These witnesses have had long experience on the river, are intelligent and disinterested, and I have no reason to doubt the truth of their statements of fact.   They severally testify that the barge was loaded in the usual manner and properly, and that the corn, save a few sacks, not exceeding a hundred, was regularly stowed away before they left Whitmon's, and the barge was then trim.   Sholes and Dunlap testify that they went into the cabin of the tow-boat and sat down at a table to figure up the quantity of corn taken aboard.   While thus engaged they felt a jar or shock, as though the boat had struck something.   Capt. Gray, who was then on the deck of the tow-boat, says "the barge made a sudden, crushing lurch;" and again he describes the shock as a "concussion, blow, or crush."   Dunlap and Sholes hastened out, and heard some of the men say the barge had struck something, and was taking water. Both went on the barge, and Dunlap in the hold.   They found she was taking water in her hold rapidly.   No water was coming over the deck.   Sholes said he heard the water "rushing into the hold."   A syphon pump was put in the hold and set to work.   Capt. Gray states that after the concussion the barge righted temporarily, and for probably five or six minutes there was nothing unusual in her shape.   He went into the hold and heard the water coming in below the dunnage and back of the wing tiers of the stowage.   He says he "heard it rush behind the cargo."   Efforts were made to get at the break by removing the cargo, but before this could be accomplished the water came over her dunnage and caused the barge to list badly, and the men were ordered out of the hold, the peril becoming so great.   It is needless to prolong this opinion by further citations from the proofs.   Suffice it to say, I am satisfied, from the whole evidence, the sinking of the barge occurred by reason of the cause alleged by the respondents.

The court finds (4) that while the steam tow-boat Iron Mountain, with the barge Ironsides No. 3 in tow, was backing out from Whitmon's landing, and when out in the river, the barge struck some unmarked, unknown, and hidden object below the surface of the water, which caused her to take water and sink, and this without negligence on the part of the owners of the tow-boat and barge, their agents or servants, and that it was an unavoidable accident.

That a loss so occurring is within the exception in the bill of lading is quite clear.   *Trans. Co.* v. *Downer,* 11 Wall. 129; *The Favorite,* 2 Biss. 502; *Williams* v. *Grant,* 1 Conn. 487.

Let a decree be drawn dismissing the libel, with costs.