## THE CITTA DI MESSINA.

(District Court, S. D. New York. April 13, 1909.)

1. SHIPPING (§ 125*)—CARRIAGE OF GOODS—LOSS OR INJURY—DEVIATION FROM VOYAGE.

Deviation is a term of art, belonging in the main to the law of marine insurance and to be interpreted by that law; but the rule as to deviation is applicable to a shipper as well as to an insurer, and any deviation from the course of navigation which experience and usage have prescribed as the safest and most expeditious mode of proceeding from one voyage terminus to the other will cast subsequent loss of, or injury to, either ship or cargo on the shipowner, without any reference to the question whether it had any bearing on the particular loss complained of.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 459; Dec. Dig. § 125.*]

2. SHIPPING (§ 125*)—CARRIAGE OF GOODS—DEVIATION.

Delay of a vessel, even upon the route prescribed by a policy or bill of lading, may amount to deviation.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 459; Dec. Dig. § 125.*]

3. SHIPPING (§ 125*)—CARRIAGE OF GOODS—DEVIATION.

Under bills of lading which recited that the vessel was bound for New York, "but with liberty to the steamer either before or after proceeding towards that port to proceed to and stay at any port or places whatsoever, although in a contrary direction to or out of or beyond the route to the said port of discharge once or oftener in any order, backwards or forwards for loading or discharging cargo or passengers or for any purpose whatsoever," the stopping of the vessel at the next port of call for 13 days awaiting cargo of which she obtained but a small part did not constitute a deviation.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 459; Dec. Dig. § 125.*]

4. SHIPPING (§ 132*)—ACTION FOR DAMAGE TO CARGO—BURDEN OF PROOF.

Where damage to cargo was prima facie within the exceptions in the bills of lading, the burden is on the shipper to establish that the goods

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

are removed from the operation of such exceptions because of the carrier's negligence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 481; Dec. Dig. § 132.*]

5. SHIPPING (§ 125*)—CARRIAGE OF GOODS—INJURY TO CARGO—LIABILITY OF VESSEL.

An Italian vessel on a voyage from Mediterranean ports to New York, in accordance with a common custom of such vessels at that season, stopped· at Spanish ports for onions, grapes, and other local products. At one of such ports she loaded onions consigned to libelants in New York, the bills of lading giving her liberty to stop and stay at other ports and also exempting her from liability for decay or for loss or damage to fruit or other perishable goods through delay or loss of time in obtaining and loading other goods at that or other ports to complete her cargo. She proceeded to another port where she expected to obtain a large consignment of grapes, and remained there 13 days, but obtained but a small part of the expected cargo. When she arrived at New York a large part of her onion cargo was lost and damaged through decay. *Held*, that under the terms of the bills of lading she was not liable for the loss, in the absence of proof that her stay in the loading ports was a departure from general usage, that it was so unreasonable as to constitute negligence, and that it was the cause of the damage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 459; Dec. Dig. § 125.*]

## In Admiralty. Libels for cargo damage.

The Messina is an Italian cargo steamer of 2,564 gross and 1,556 net tons, and was in the year 1908 plying between Mediterranean ports and New York in what was known as the "Creole Line."

From July to October vessels in this trade bound for the United States frequently stop at the Spanish ports of Gandia and Denia for onions, and during the same months, or some of them, stop also at Almeria and Malaga for grapes and other local products. The "onion ports" are but 15 miles apart, and at them between August 31 and September 2, 1908, the Messina received a large number of onions consigned to libelants and others in New York.

On September 3d she left Denia (the last onion port), and arrived at Almeria on the morning of September 4th. She went there pursuant to owners' orders, advising the master that he would "probably get 12,000 barrels of grapes." I find that this expectation was the result of information given or promises made to the owners by one Canet, who was at once the ship's agent in Almeria, and largely engaged· in the business of collecting and exporting grapes on behalf of producers in the vicinity.

The Messina remained in Almeria until the evening of September 16th, and during that time she received, instead of the large quantity of grapes expected, no more than 651 barrels, and none at all came on board from the 4th to the 8th of September. The 651 barrels could have been laden in half a day.

While the Messina was lying at Almeria other vessels, thought to be faster or otherwise more desirable, came into port and took away whatever grapes were ready for shipment. Canet had no grapes legally engaged, grape owners were entirely at liberty to ship by any vessel they pleased, and they preferred vessels other than the Messina. Being ·advised of a partial cargo awaiting him in Malaga, the Messina's master finally telegraphed his owners for permission to leave Almeria, and was at once authorized so to do.

At Malaga the Messina had good dispatch and made her usual trip across the Atlantic. On arrival in New York on October 5th the onion cargo was found to be extensively decayed; 1,028 cases of the total of 25,203 were seized and destroyed by the department of health, and the merchantable quality of the rest was much impaired by decaying onions producing stains on the crates and contaminating the sound contents.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The bills of lading under which the shipments were made recited that the Messina was bound for New York, "but with liberty to the steamer either before or after proceeding towards that port to proceed to and stay at any ports or places whatsoever, although in a contrary direction to or out of or beyond the route to the said port of discharge, once or oftener, in any order backwards or forwards, for loading or discharging cargo or passengers or for any purpose whatsoever; and all such ports, places and sailings shall be deemed included within the intended voyage." It was further agreed in and by the bills that the steamer was "not answerable for * * * decay * * * or inherent deterioration," and also that "steamer not to be responsible for any loss or damage which may arise to fruit or other perishable goods on board, through delay, or loss of time in obtaining and loading other goods to complete the cargo at this or other ports at which she may hereafter call."

Under favorable conditions onions of the kind under consideration will last without rotting for between three and four months after arrival in the United States. Such conditions require storage in a place with a temperature of not over 60 degrees. While lying in Almeria the master of the Messina declares that he had "good weather same as spring," it "was cool," as in "that part of Spain the heat is never felt"; although another witness testifies that the sun temperature at Almeria in September may be 100° Fahrenheit. I do not find the two statements inconsistent, and believe the weather to have been comfortably cool, but higher than was favorable for keeping onions sound.

There is little ventilation in the hold of a ship at anchor, even though hatches be kept open and ventilators up, and this was the Messina's condition at Almeria. Onions, grapes, almonds, and raisins (called in the evidence "Spanish products") are shipped to the United States only during three or four months of the year, beginning in July. The business is not sufficient to furnish full cargoes for west-bound vessels, and it has for years been attended to by steamers like the Messina, which started partly laden from an Italian port.

Visiting four Spanish ports en route is not uncommon, and is expected in the trade. It is also well known that tramp steamers do not usually have as quick dispatch as swifter passenger vessels, because cargo will be diverted by the shippers to the most desirable vessel in any given port at any time. It was therefore not surprising that the Messina did not get her hoped-for Almeria cargo, but 13 days for loading and waiting in one Spanish port is not expected by the trade. Nor does the evidence show any instance of such long delay at one port. In my opinion 15 days for four Spanish ports is thought a long time, and 20 days excessive. The Messina spent August 31st to September 18th (18½ days) between Gandia and Malaga (both inclusive).

The onions laden at Gandia seemed to the master to have been recently harvested. He doubted whether they were ripe, and they had to be packed in crates after his ship arrived at the port; a little more than half his cargo was obtained there. There is no evidence as to the time of harvesting the Denia onions.

The libels allege that damage to the onions was due to the negligence of the Messina "in remaining in the port of Almeria from the 3d to the 16th September, 1908, which was entirely unnecessary and constituted a deviation."

Mr. Burlingham, for libelants.

Mr. Kirlin, for claimants.

HOUGH, District Judge (after stating facts as above). It is obviously advantageous, if not essential, to libelants' case, to show that the facts found constitute deviation. That "deviation" is a term of art, belonging in the main to the law of marine insurance, and to be interpreted by that law, seems to me to have been overlooked in argument; and this belief on my part must excuse some review of the subject.

If an insured shipowner fails to pursue that course of navigation which experience and usage have prescribed as the safest and most expeditious mode of proceeding from one voyage terminus to the other, he violates a tacit but universally implied condition of the contract between himself and his underwriter, who is therefore freed from liability for loss subsequent to deviation because the assured has enhanced or varied the risks insured against. 2 Arnould, Mar. Ins. (8th Ed.) § 376; 1 Phil. Ins. § 977.

If the assured cargo owner have his cargo on a vessel which deviates, he for the same reason may lose (though by no fault of his own) all remedy for subsequent loss against his underwriter, but may proceed against the wrongdoing ship for his damages. It is not, of course, necessary that a cargo owner, in order to recover against his carrier for losses subsequent to deviation, should have himself lost insurance protection by reason thereof. The voyage is the same, whether viewed from the standpoint of insurer or shipper, and any deviation therefrom will cast subsequent loss of or injury to either ship or cargo on the shipowner. The reason also is the same, viz., that the carrier by deviating from a voyage described alike in insurance policy and bill of lading, has broken the warranty not to deviate, thereby terminated his own insurance, and given the shipper a right either to rescind the contract of shipment and treat the goods as converted by the deviator, or to accept the goods, holding the ship responsible for damage subsequent to warranty broken, without any reference to the question whether the deviation had any bearing on the particular loss complained of. Thorley v. Orchis S. S. Co., 1 K. B. (1907) 660; Thatcher v. McCulloh, Olcott, 365, Fed. Cas. No. 13,862.

In effect the deviator loses his own insurance, and becomes the insurer of his cargo from the date of deviation. If, therefore, the Messina was guilty of a deviation, it is wholly immaterial whether her stay at Almeria had or had not any causal connection with the rotten onions found on board in New York. If they were sound when the deviation occurred, the ship must answer for their subsequent damage. That delay, even upon the route prescribed by policy and or bill of lading, may amount to deviation, has been often held (Company of African Merchants v. Ins. Co., L. R. 8 Exch. 154; Coles v. Marine Ins. Co., 3 Wash. C. C. 159, Fed. Cas. No. 2,988; Audenried v. Mer. Mut. Ins. Co., 60 N. Y. 482, 19 Am. Rep. 204), though the recent British marine insurance act (1906) has excluded delay from the definition of deviation (section 46), while giving the insurer (by section 48) the same release from liability "from the time when the delay becomes unreasonable."

It being, however, still the law of the United States that a deviation (eo nomine) occurs the moment a delay even upon the prescribed route becomes unreasonable, the libelants here insist that the Messina's reasonable stay in Almeria expired in at most four days, yet they have endeavored to show further that her actual stay in the then conditions of weather was injurious to their onions; a labor quite needless if the delay produced deviation.

It seems to me that in some cases where shippers have proved that the ship had injured their goods by reason of delay in ports of call, or calls in port unreasonable in respect of cargo already laden, the courts, while rightly awarding damages for breach of contract, i. e., for negligence, have spoken loosely of deviation as if that were the ground of decision. Glyn v. Margetson, A. C. (1893) 351, and cases cited. In Swift v. Furness (D. C.) 87 Fed. 345, the carrier of perishable cargo was authorized by his bill of lading to "make deviation," and accordingly did so to the injury of his cargo, yet was held responsible. And see The Bordentown (D. C.) 40 Fed. 689, where the doctrine of deviation was invoked to fix liability on a tug which negligently took her tow beyond its destination, thereby exposing it to storm and causing loss. These were not cases of deviation in any proper sense; that word implies a voluntary departure from the usual course of the voyage "in reference to the terms of a policy of marine insurance" (Hostetter v. Park, 137 U. S. 40, 11 Sup. Ct. 1, 34 L. Ed. 568), and if (for example) the vessels concerned in the Glyn and Swift Cases (supra) had done what they did when insured under voyage policies describing the voyages, as in the bills of lading on which the cases were actually defended, it would have been impossible to contend that a deviation had occurred. So, in this case, the voyage described in the bills of lading is quite elastic enough to prevent even a longer delay than that in Almeria harbor from producing deviation, "in reference to the terms of a policy of marine insurance" setting forth the same voyage in the same language. C. F. Phillips v. Irving, 7 M. & G. 325; Columbian Ins. Co. v. Catlett, 12 Wheat. 383, 6 L. Ed. 664, for striking instances of delay without deviation.

Libelants cannot, therefore, recover on the ground just considered; and it remains to inquire whether claimants were guilty of negligence, and are therefore deprived of the protection of the exceptions in their bills of lading.

The question of the burden of proof in actions such as this has been set at rest by The Folmina, 212 U. S. 362, 29 Sup. Ct. 363, 53 L. Ed. ——, the nature of the injury shows this damage to be prima facie within the exceptions of the bills, and the burden is on the shipper to establish that the goods are removed from their operation because of the carrier's negligence. The only negligence assigned is delay in Almeria, and what transforms delays permitted by bills of lading, such as those in suit, into negligence, will always depend upon what voyage was agreed upon in a business sense,—the agreement need not have been for the quickest or most direct mode of transportation. Evans v. Cunard S. S. Co., 18 T. L. R. 374, citing and explaining Glyn v. Margetson, supra. So, in this case, libelants did not agree for a quick or direct method of conveyance; they did agree that the Messina could do just what she did, provided she did not take unreasonable advantage of the bargain. But that bargain is to be interpreted according to the general usages of the trade, even though not known to any particular shipper. Hostetter v. Parks, supra; for the facts in which case, see fuller report in Hostetter v. Gray (D. C.) 11 Fed. 179.

It follows, in my judgment, that the libelants must show, in order to recover, that the ship's stay in Almeria was a departure from general usage, that it was unreasonable in respect of the cargo already laden, and that it was the cause of the damage complained of. The evidence falls short of these requirements. These libelants have made no better case than those in The Hindoustan, 67 Fed. 794, 14 C. C. A. 650, and not nearly so good a one as in The St. Quentin (C. C. A.) 162 Fed. 883.

Libel dismissed, with costs.