NATIONAL CARBON CO. v. ALASKA S. S. CO.

THE EUREKA.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1918. Rehearing Denied July 1, 1918.)

No. 3102.

1. SHIPPING ⬅132(5)—CARRIAGE OF GOODS—AUTHORITY OF AGENTS.
    Evidence held to establish the authority of shipping agents to act for a ship in respect to cargo received for a voyage.

2. SHIPPING ⬅125—DAMAGE TO CARGO—LIABILITY OF VESSEL.
    A ship detained at Colon by slides in the canal held liable for damage to cargo, which it refused to deliver there for transshipment, although the shipper notified it of the perishable character of the goods and offered to pay all expense of discharging.

Appeal from the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Suit in admiralty by the National Carbon Company against the steamship Eureka; the Alaska Steamship Company, claimant. Decree for respondent, and libelant appeals. Reversed.

Appeal from a decree dismissing a libel alleging the following facts:
On September 8, 1915, libelant, National Carbon Company, shipped at New York on the Eureka, bound for San Francisco, certain dry battery cells consigned to libelant at San Francisco. The ship sailed, but about October 1,

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1915, libelant heard that the Panama Canal was closed to navigation. Inquiry was at once made of the ship's agents. at Philadelphia as to the whereabouts of the vessel. The agents replied that the vessel was detained because of the canal slide, and was at Colon, whereupon libelant notified the agents of the ship that the goods were perishable and offered to pay costs for discharging and restowing cargo to be disturbed in reaching the goods. The agents failed to deliver and refused demands for delivery. Libelant alleges that nothing was done by those in charge of the ship until about November 22d, when the cargo was delivered to libelant at New Orleans, and it was found to be damaged as a result of the failure of the ship to perform its contract.

The steamship company, claimant, answered that the ship was owned by the Pacific Coast Steamship Company, and subchartered through others to the Oregon-California Shipping Company, to which last company the shipments were delivered for transport, freight prepaid, that alleged demands for delivery were not made, and that by certain clauses in the bills of lading the ship was exonerated:

"That in case the steamer shall * * * be prevented from any cause from proceeding in the ordinary course of her voyage, to transship the goods to their destination by any other steamer; * * * that the carrier shall not be liable for loss or damage occasioned by causes beyond his control or accidents of navigation of whatsoever kind; * * * that the carrier shall not be liable for loss or damage occasioned by * * * change of character, * * * or any loss or damage arising from the nature of the goods, * * * nor for any loss or damage caused by the prolongation of the voyage.

"(2) No carrier shall be liable for delay, nor in any other respect than as warehouseman, while the said property awaits conveyance from any point of transshipment. * * *

"(8) When the loading, transport, transshipment, or delivery is prevented in consequence of ice, weather, epidemic, quarantine, blockade, war, sedition, strikes, troubles, labor agitations, and all analogous circumstances whatever, the captain, the company, or the agents shall be entitled to load, discharge, transship, put into warehouse or quarantine depot, or into a lighter, hulk, or craft, and to deliver all or any part of the goods, whether the terminus of the voyage or not, and all expenses of transshipment or warehousing of customs, * * * and all extra expenses of whatever kind incurred in consequence of the above circumstances will be entirely for account of the shipper, consignee, or party claiming the goods."

The answer also alleges that, when it was apparent that the canal would remain closed for some time, the owners and charterers and agents of the ship tried to find some method of transshipping the cargo to destination, and whether the ship could be sent via the Straits of Magellan; that after diligent investigation they believed it was best for the consignors and consignees of the cargo that the ship be diverted to New Orleans and her cargo there transshipped by rail to destination, and that the Oregon-California Shipping Company on November 5th ordered the ship to proceed to New Orleans, at which port she arrived November 12th: that before proceeding to New Orleans the consignees were advised of the movement of the ship, and that libelant consented to the ship going to New Orleans and transshipment of cargo by rail; that the cargo was discharged at New Orleans, and libelant's cargo delivered to libelant about the 16th of November. For further defense the answer pleads provisions of the bills of lading excusing the carrier from damage to goods on account of inherent weakness, natural causes, and other things, and asserts that the damage, if any, arose from one of the excepted causes; that the bills of lading requiring notice of damage to be filed with the steamship company were not complied with.

Howard S. Harrington, Harrington, Bigham & Englar, and T. Catesby Jones, all of New York City, Revelle & Revelle, of Seattle, Wash., and Denman & Arnold, William Denman, and William B. Acton, all of San Francisco, Cal., for appellant.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., Platt & Platt,

Robert Treat Platt, and Hugh Montgomery, all of Portland, Or., and Farrell, Kane & Stratton, of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The District Court based its decision upon the ground that the evidence was insufficient to establish that Rubelli's Sons, of Philadelphia, were general agents of the ship, and not merely agents for soliciting freight for the Oregon-California Shipping Company. In order, therefore, to reach a decision upon the contention that this was error, we have carefully read the evidence, which is in the form of depositions and records, and without making lengthy statement will give our conclusions. Reid v. Fargo, 241 U. S. 544, 36 Sup. Ct. 712, 60 L. Ed. 1156; The Nyack, 199 Fed. 383, 118 C. C. A. 67.

[1] Two shipments were made, one from New York, another from Philadelphia. The contracts of carriage were made by Mitchell, the traffic manager for the libelant, with Phelps Bros. & Co., of New York, and Rubelli's Sons, of Philadelphia. About September 7th Mitchell wrote to Rubelli's Sons, at Philadelphia, inclosing bills of lading, and advising them that the charges had been prepaid to destination, and asking them to send to the National Carbon Company ocean bill of lading. The bill of lading for the goods shipped from New York to San Francisco was signed by J. W. English, for Oregon-California Shipping Company, Incorporated; English being connected with Phelps Bros. & Co., who were the New York agents of Rubelli's Sons at Philadelphia. The goods shipped at Philadelphia were under bills of lading signed R. B. Bates, for Oregon-California Shipping Company, Incorporated; Bates at the time being assistant manager for Rubelli's Sons. On October 1, 1915, Mitchell, having read in the papers that there had been a slide in the Panama Canal, telegraphed Rubelli's Sons for information of the whereabouts of the Eureka, and when the ship would reach California points. On October 2d Rubelli's Sons answered that the ship arrived "this side Cristobal September 29th." On October 8th Mitchell went to Philadelphia, and on the next day advised Kurz, a partner in Rubelli's Sons, and Davis and Bates, employés of the partnership, that the goods of the National Carbon Company were perishable, and that he thought it advisable to take them out of the ship. Examination of the stowage plan of the ship was made, and Mitchell told them that, rather than have further delay, he would go to Colon, take the goods, and pay all expense of taking out other goods to get at libelant's, and would put the other goods back in the hold, if necessary, as they could not afford to have their battery cells remain there. Mitchell, after explaining the character of the goods, then demanded the goods; but Rubelli's Sons & Co., although they stated they were doing all in their power to get the managers of the Oregon-California Shipping Company to transship the goods, or do something in order to satisfy demands, refused to deliver. Repeated demands were made about the 14th and 16th days of October, but delivery was refused.

We think it evident that, if the goods had been delivered in Colon at that time, the damage would have been obviated, for there were a number of ships plying between Colon and New York, upon some of which freight room could have been obtained. Mitchell again went to Philadelphia about October 22d, and was shown a copy of a telegram which Rubelli's Sons had sent on the 18th instant to the Oregon-California Shipping Company, saying that the National Carbon Company insisted that the shipments should not go via Magellan, because the batteries would be worthless on arrival at destination, and that the National Carbon Company offered to pay all expenses of discharging, including loading back any other goods, in order to forward their goods from Colon. Transshipment was advised, and response asked. About October 22d, in a circular signed by Rubelli's Sons, agents, and addressed to those who had cargo on the Eureka for the Pacific Coast, possible arrangements respecting transshipment of all cargo across the isthmus were set forth, with statement by Rubelli's Sons that they, "as agents" for the Oregon-California Shipping Company, were in daily touch with the captain of the steamer, and that from his first report it was hoped that the steamer could pass through the canal about October 10th, but that it would be January, 1916, before the canal would be opened.

About November 1st, Kurz, of Rubelli's Sons, went to Portland, Or., in order to get definite action at Portland. After conferences with the Oregon-California Shipping Company, Kurz cabled to the master of the ship with respect to possible transshipment, but finally, on November 4th, cabled the master to "sail to-morrow morning to New Orleans; * * * we will be there on arrival." The ship went to New Orleans, and reached there about November 21st. In New Orleans Mitchell met Kurz, of Rubelli's Sons, and Williams, the general manager of the Oregon-California Shipping Company, at New Orleans. The goods of the libelant were unloaded and found to be badly damaged as a result of extreme heat. Mitchell made claim upon the Oregon-California Shipping Company, and then shipped his goods to New Jersey, where they were repaired and thereafter sold.

It is clear also that between October 9th and 22d the Oregon-California Shipping Company knew of probable long delays in reopening of the canal, and was in consultation concerning the possible transfer of the cargo of the Eureka, and the possible liability of the shipping company because of the delay on account of the slides. Kurz, who while in Portland signed the cables to the master of the ship, acted for the shipping company and evidently was in close direct relation to the shipping company with respect to the matters involved in the telegrams. It is also recalled that the bills of lading were signed by the employés and agents of Rubelli's Sons, and the merchandise was received on the ship on the faith of the bills of lading. In our opinion, when the circumstances are all considered, they show that Rubelli's Sons acted directly for the shipping company, and the ship is liable for the damages by detention after refusal to deliver at Colon. The Coventina (D. C.) 52 Fed. 156.

[2] The case is quite like that of The Martha (D. C.) 35 Fed. 313. There, when the ship put into a port for repairs, and it was made known to the consignee that a long delay of the ship was necessary, he applied to the owners of the steamer, through her agent at New York, for delivery of the freight, glycerine, and offered to pay the full freight under the bill of lading, together with all his incidental expenses. The shipowner refused to make delivery, and, after notification by libelant that he would hold the ship for damages consequent upon detention, suit was brought for damages. Judge Benedict held that, the shipowner having refused to make delivery and having, without reasonable excuse, held the goods on the contract in the ship until her arrival at New York, the liability of the ship for all damages caused to the libelant by reason of the detention seemed clear.

Nor can claimant prevail under the exceptions contained in the bill of lading. Libelant bases its action for damages, not upon delay, but upon refusal of the owner to comply with the demand to deliver to it the merchandise at Colon. The carrier is also liable, where the shipper has notified the carrier of the perishable nature of his goods, and the carrier without reason or necessity has deprived the shipper of the benefit to flow from such shipment. Swift v. Furness, Withy & Co. (D. C.) 87 Fed. 345; The Citta de Messina (D. C.) 169 Fed. 472.

There can be no serious doubt that long continuous excessive heat damaged the battery cells. If the ship had sailed from Colon about October 11th, when transshipment was advised by the master of the ship, the damage would have been avoided. · But the master asked instructions of the appellees, and they responded by finally sending orders to sail for New Orleans. Appellant did all it reasonably could to save its property from damage, and ought to have redress 'for the holding of its perishable goods after demand.

The decree is reversed, and the case will be remanded, with directions to enter a decree in favor of libelant for $4,953.08 as damages, together with interest and costs.

Reversed.